# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| **TERRI TARWATER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case number 4:14cv0179 TCM** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

This 42 U.S.C. §§ 405(g) and 1383(c)(3) action for judicial review of the final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (Commissioner), denying the application of Terri Tarwater (Plaintiff) for supplemental security income (SSI) under Title XVI of the Social Security Act (the Act), 42 U.S.C. § 1381-1383b, is before the undersigned Magistrate Judge pursuant to the written consent of the parties.  See 28 U.S.C. § 636(c).

## Procedural History

Plaintiff applied for SSI in October 2010, alleging she was disabled as of December 1, 2009, by bipolar disorder, post-traumatic stress disorder (PTSD), and personality disorder. (R.[1] at 127-32, 184.)  Her application was denied initially and following a June 2012 hearing before Administrative Law Judge (ALJ) Amy Klingemann. (Id. at 8-28, 33-71, 74-78.)  After reviewing additional evidence, the Appeals Council denied Plaintiff's request for review,

---

[1]References to "R." are to the administrative record filed by the Commissioner with her answer.

effectively adopting the ALJ's decision as the final decision of the Commissioner.[2] (Id. at 1-4.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, and Delores Gonzalez testified at the administrative hearing.

At the beginning of the hearing, Plaintiff amended her alleged disability onset date to be March 5, 2008 – the day following an adverse decision on a previous SSI application. (Id. at 37-38, 148.) Her attorney explained that the only physical limitation alleged is blindness in one eye. (Id. at 39.)

Plaintiff was thirty-five years old at the time of the hearing. (Id. at 40.) She is 5 feet tall and weighs 198 pounds, having gained approximately 63 pounds since having a baby in July 2011. (Id.) She dropped out of school in the sixth grade because of family problems and learning difficulties. (Id. at 41.) She tried to, but could not, obtain a General Equivalency Degree (GED). (Id. at 41-42.)

Plaintiff has a driver's license. (Id. at 41.) She hates driving, however, because she has panic attacks when she does. (Id. at 55.)

Plaintiff left her last job, at Boone Center, because she had a nervous breakdown. (Id. at 42.) She briefly worked as an assistant at a daycare center. (Id. at 42-43.) She left that job because of the stress and the requirement that she take classes she cannot afford. (Id. at 43.)

---

[2]The additional evidence is a form completed by Dr. Arian pursuant to Plaintiff's application for public assistance. (Id. at 414-15.) The form simply refers to his clinic notes. (Id.)

She worked as a waitress at Steak 'n Shake for nine months, and quit the job three times during that period due to having nervous breakdowns. (Id.) She kept being hired back. (Id. at 44.) She first testified that she could not recall why she left that job, but later attributed the reason to having a baby. (Id. at 44, 57.) She also worked briefly as an independent contractor for a man doing irrigation work. (Id. at 45.) This job ended when the man's business went under. (Id.)

Asked what keeps her from currently working, Plaintiff explained that she cannot keep a job because of her depression and "high anxiety." (Id. at 46.) She ends up having nervous breakdowns, crying, and being stressed. (Id.) Plaintiff is seeing a doctor, Dr. Arain, and a therapist, Mary Beth. (Id. at 47.) She has assistance from a community support worker one to three times a month. (Id.) Also, she takes medication, i.e., Cymbalta (an antidepressant), Xanax (an anti-anxiety medication), and Abilify (an antipsychotic medication). (Id. at 48.) She was recently started on a new medication for anxiety, but could not recall the name. (Id. at 48, 59.) The medications help with her depression. (Id. at 48.) She has no problems when she is at home, but does when out in public. (Id. at 48, 60.) When she does go out, for instance to the library, she tries to limit her time to ten to fifteen minutes. (Id. at 56.) She takes her children to the swimming pool during the summer. (Id. at 53.) And, if her daughter has to go somewhere, Plaintiff drives her. (Id.)

Plaintiff has had at least five sessions of shock treatment. (Id. at 57-58.) They did not help. (Id. at 58.)

Plaintiff has trouble reading, concentrating, sitting still, and learning. (Id. at 48-49.) She does not have trouble with people, but does try to avoid them as much as possible. (Id. at 50.) If she had to fill out a form requiring more than her name and address, she would start crying and "lose it." (Id. at 56, 60-61.)

Plaintiff described a typical day as taking care of her baby and dealing with her sixteen-year old daughter, keeping the house clean, and making sure her daughter does her schoolwork when she gets home. (Id. at 50, 51.) She does not have any trouble taking care of her children because they are the reason she keeps herself together. (Id. at 50.) Plaintiff also has an eleven-year old daughter that lives with her paternal grandfather. (Id. at 51.) Plaintiff crochets, making such things as blankets, hats, baby bags, and purses. (Id. at 52.) She learns the patterns by watching videos of someone doing them. (Id.)

Ms. Gonzalez, testifying without objection as a vocational expert (VE), was asked to assume a claimant of Plaintiff's age, education, and past work experience who has no exertional limitations, but cannot use monocular vision and is limited to simple, repetitive tasks with occasional contact with the public and frequent contact with coworkers and supervisors. (Id. at 66.) This claimant is further limited to occasional changes in the workplace. (Id.) Asked if this claimant can perform Plaintiff's past relevant work, she replied that she can perform the job of a housekeeping cleaner. (Id. at 66-67.) If the hypothetical claimant also needs to leave work three or four hours early once every other week because of a panic attack, there are no jobs that will accommodate this restriction. (Id. at 67.)

Asked by Plaintiff's counsel to assume a hypothetical claimant who cannot focus or concentrate on a task for longer than an hour at a time and for no more than half the workday, the VE replied that such a claimant cannot sustain employment. (Id.) If a claimant with Plaintiff's age, education, and past experience cannot "behave in an emotionally stable manner" but can work independently, she can sustain employment. (Id. at 68.) If the claimant will need to leave the workplace at least once a day at an unscheduled time, the claimant cannot engage in competitive work. (Id.)

The VE further stated that her testimony was consistent with the *Dictionary of Occupational Titles* (DOT). (Id. at 67.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms completed as part of the application process, documents generated pursuant to Plaintiff's application, records from health care providers, and assessments of her mental abilities.

When applying for SSI, Plaintiff completed a Disability Report, listing her height as 4 feet 11 inches and her weight as 150 pounds. (Id. at 184.) She stopped working on December 1, 2009, because of her condition. (Id.) She completed the sixth grade and had not been in special education classes. (Id. at 185.)

When asked on a Function Report what she was able to do before her illnesses that she can no longer do, Plaintiff explained that she has always had mental problems. (Id. at 202.) She sleeps too much and sometimes does not bathe or change out of her pajamas because she is depressed. (Id.) She does light cleaning and laundry; these chores take her all day. (Id.

at 203.)  She goes outside daily and shops once a week for an hour each time for food and clothes.  (Id. at 204.)  She is easily irritated by others.  (Id. at 206.)  Her impairments adversely affect her abilities to remember, complete tasks, concentrate, understand, follow instructions, and get along with others.  (Id.)  She cannot pay attention long.  (Id.)  She cannot follow written instructions because she does not read well and does not follow spoken instructions because she has difficulty remembering them.  (Id.)  She is easily irritated by family and friends but gets along "pretty good" with authority figures.  (Id. at 206, 207.)

A friend of Plaintiff's for the past year completed a Function Report on Plaintiff's behalf.  (Id. at 190-97.)  Her answers generally mirror Plaintiff's with the exception of the friend stating that Plaintiff avoids authority figures if possible or responding "don't know" to some of the questions.  (Id.)

Plaintiff had reportable annual earnings for years from 1993 to 2007, inclusive, 2009, and 2010.  (Id. at 138.)  Her highest earnings were $9,604,[3] in 2006.  (Id.)  In only one other year, 1999, did her earnings exceed $5,000 annually.  (Id.)

The relevant medical records before the ALJ are summarized below in chronological order and begin with those of Ubaldo Rodriguez, M.D., of Plaintiff's September 1, 2009, visit.  (Id. at 248.)  She was referred to a psychiatrist, William Wang.  (Id. at 248.)  Her lab work tested negative for illegal drugs.  (Id. at 254.)  Three weeks later, Plaintiff saw Dr. Rodriguez for hepatitis C and high cholesterol; she was described in the checklist format as being very aggressive.  (Id. at 244.)  In October, Dr. Rodriguez prescribed Xanax and Elavil for Plaintiff

---

[3]All amounts are rounded to the nearest dollar.

and noted that she needed further psychiatric care. (Id. at 243.) In November, during a routine visit, Plaintiff requested an increase in her Xanax dose. (Id. at 240.) Her weight was 170 pounds. (Id.) Anxiety and depression were checked as being present. (Id.)

Also in November, Plaintiff consulted Bruce R. Bacon, M.D., for evaluation of her hepatitis C. (Id. at 257.) Dr. Bacon wrote Dr. Rodriguez that Plaintiff "complained of occasional fatigue and difficulty with her mental health issues of bipolar and personality disorders." (Id.) He noted that she had not wanted to go through therapy for her hepatitis C two years earlier because of personal problems. (Id.) He also noted that she would need to establish psychiatric care before her hepatitis would be treated. (Id.) She was to be scheduled for a liver biopsy. (Id.)

In January 2010, Dr. Bacon wrote Dr. Rodriguez to inform him of the results of the biopsy (mild activity with no significant fibrosis) and that Plaintiff was interested in starting therapy for her hepatitis C. (Id. at 256.) He reported that she was "still having some difficulty with anxiety/depression," for which she took alprazolam (the generic form of Xanax). (Id.)

In February, Plaintiff saw Dr. Rodriguez for a check-up, reporting that Elavil was not working and she needed a different dose of Xanax. (Id. at 239.) Her diagnoses included hepatitis C, high cholesterol, chronic knee pain, and severe psychiatric problems. (Id.) Anxiety and depression were marked as being present. (Id.) She was described as upset and out of control. (Id.)

In March, Plaintiff consulted a psychiatrist, M. Sameer Arain, M.D., at Crider Health Center, explaining that she had had a nervous breakdown at work and was told to get help. (Id. at 288-92.)  She reported that her psychiatric history included leaving home at age fourteen; being hospitalized five times, with the last admission in 2007; attempting suicide five times, the last time being in 2007; and having been prescribed, at various times, Paxil, Zoloft, Valium, Xanax, tramadol, and other drugs she could not recall.  (Id. at 289.)  She was not currently on any medications.  (Id.)  She had not any electroconvulsive therapy (ECT) treatments (formerly known as electroshock therapy or shock treatment) and had not engaged in any self-mutilation.  (Id.)  She started drinking when she was 21 and stopped in 1999; she started daily using marijuana when she was 10 and stopped in 2007; she started daily using cocaine when she was 26 and stopped two years later.  (Id. at 289-90.)  She had been in rehabilitation twice, the last time was in 2009.  (Id. at 290.)  She had been incarcerated at least twenty times.  (Id.)  The charges varied from possession of drugs to burglary to driving with a suspended license.  (Id.)  She reported a history of sexual, physical, and emotional abuse, but became tearful and did not want to talk about it.  (Id.)  Plaintiff explained that she could not hold a job because of anxiety.  (Id. at 288.)  She was depressed, irritable, and angry. (Id.)  She felt hopeless and could not concentrate or focus.  (Id.)  She had crying spells and slept and ate more.  (Id.)  On examination, Plaintiff was fairly groomed, cooperative, and alert and oriented to time, place, and person.  (Id. at 291.)  She had good eye contact, normal speech, logical and goal-directed thought, fair insight and judgment, fair intellect, and no delusions, paranoia, or suicidal or homicidal ideations.  (Id.)  She had a reactive mood and

affect.  (Id.)  The provider's diagnoses were major depressive disorder, moderate; anxiety

disorder; rule out bipolar disorder; rule out PTSD; and cocaine and alcohol dependence, in

remission.  (Id.)  Her current Global Assessment of Functioning (GAF) was 55 to 60.[4]  (Id.)

Plaintiff was given a fifteen-day prescription for Prozac, Vistaril, and Lamictal; advised to

get individual counseling; and was to return in two weeks.  (Id.)

　　　Plaintiff returned on April 1, reporting that she was stressed because she had been laid

off work.  (Id. at 287.)  Her sleep and energy levels were better.  (Id.)  She was less

aggravated and frustrated.  (Id.)  She had been working in her garden.  (Id.)  On examination,

she was as before.  (Id.)  Her prescriptions were renewed for thirty days.  (Id.)

　　　In May, Plaintiff told Dr. Arain that her anxiety and depression were better.  (Id. at

286.)  She was sleeping well, but having "crazy dreams" and increased sexual desire.  (Id.)

There was no evidence of psychosis.  (Id.)  On examination she was as before, with the

exception of having a full range of affect and a normal mood.  (Id.)  Her prescriptions were

renewed for one month.  (Id.)

　　　When Plaintiff next saw Dr. Arain, in June, she reported that she was going to start

classes for a GED, but she could not focus, had a history of Attention Deficit Hyperactivity

---

[4]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th Ed. Text Revision 2000) [DSM-IV-TR], the [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010).  A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34 (emphasis omitted).

Disorder (ADHD), and requested ADHD medications.  (Id. at 285.)  Plaintiff also stated that she had a lot of anxiety, mood swings, and a mean attitude.  (Id.)  Although she reported that she was easily angered and irritated, she was pleasant and cooperative during the interview. (Id.)  On examination, she was casually dressed and alert and oriented to time, place, and person.  (Id.)  She had good eye contact, logical and goal-directed thought, fair insight and judgment, no delusions or paranoia, and no suicidal or homicidal ideations.  (Id.)  Abilify was added to her other prescriptions.  (Id.)

On July 8, Plaintiff reported to Dr. Arain that she had had a rash and was dizzy when taking the Abilify, so she had stopped taking it after the first week.  (Id. at 283-84.)  She continued to get dizzy, however, when she changed positions.  (Id. at 283.)  She was still anxious and easily became angry and aggravated.  (Id.)  She was depressed about her financial situation.  (Id.)  On examination she was as before.  (Id.)  Her diagnoses and prescriptions had not changed, with the exception that Abilify was discontinued.  (Id. at 284.)

Three days later, Plaintiff was admitted to St. Mary's Health Center, hospitalized for six days, and received two ECT treatments for a severe depressive episode.  (Id. at 333-34.) Two days after release, on July 19, Plaintiff had another ECT treatment.  (Id. at 331.)  She was described as continuing to be symptomatic.  (Id.)  Her response to ECT was to be reassessed.  (Id.)  The same results and concerns were noted following her July 30 ECT treatment.  (Id. at 332.)

Dr. Arain next saw Plaintiff on August 6.  (Id. at 281-82.)  There was no change in his examination findings although Plaintiff reported she had received ECT at St. Mary's when

hospitalized there for depression and suicidal ideations three weeks earlier. (Id. at 281-82.) She could not recall what medications she had been prescribed when discharged. (Id. at 281.) She reported she was not taking her medications as prescribed. (Id.) Her medications and diagnoses were unchanged. (Id. at 282.) Plaintiff was to return in two weeks. (Id.)

Plaintiff did return, telling Dr. Arain that she sometimes felt like hurting her mother because her mother got on her nerves. (Id. at 279-80.) She would not, however, follow through on those feelings. (Id. at 279.) She continued to get aggravated easily and had "trust issues." (Id.) She was sleeping a lot. (Id.) Her diagnoses included major depressive disorder, recurrent; PTSD; borderline anti-social personality; and cocaine and alcohol dependence, in remission. (Id. at 280.) Her prescriptions were renewed. (Id.) She was to return in two weeks. (Id.)

Plaintiff told Dr. Arain when she saw him on September 3 that she had gone to vocational rehabilitation and needed a letter stating that she cannot work. (Id. at 277-78.) She reported she had not been able to keep a job for longer than one month because of her unstable mood and inability to handle stress. (Id. at 277.) She was sober, but depressed. (Id.) There was no evidence of psychosis. (Id.) Her prescriptions and diagnoses were unchanged. (Id. at 278.)

Two weeks later, Plaintiff reported that she was feeling better and sleeping well. (Id. at 275-76.) Her mood was good and she had no manic behavior. (Id. at 275.) Her prescriptions and diagnoses were unchanged. (Id. at 276.)

Two weeks after that, on September 28, Plaintiff reported to Dr. Arain that she was having conflicts with her mother. (Id. at 273-74.) She was frustrated because her mother was trying to control her, but she had no other place to live. (Id. at 273.) On examination, she was as before. (Id. at 273.) Her prescriptions and diagnoses were unchanged. (Id. at 274.) Two days later, Plaintiff reported she was feeling good and had talked with her mother. (Id. at 271-72.)

When she next saw Dr. Arain, on October 22, Plaintiff was no longer living with her mother and was staying with a friend. (Id. at 269-70.) She was going to work the next week and was okay. (Id. at 269.) She had been hospitalized since her last visit. (Id.) She was as before on examination. (Id.) Prescriptions for trazodone and Paxil replaced the Prozac and the smaller of the two dosages of Lamictal. (Id. at 272.)

Plaintiff informed Dr. Arain on December 22 that she had stopped taking her medications because she was thirteen weeks' pregnant. (Id. at 267-68, 362-63.) Her mood was good. (Id. at 267.) She lived with a roommate. (Id.)

Five months later, in April 2011, Plaintiff again saw Dr. Arain. (Id. at 360-61.) She was twenty-nine weeks' pregnant and reported she was calmer. (Id. at 361.) The plan was for her to resume taking medications after she delivered. (Id.)

On August 2, Plaintiff told Dr. Arain that she had had a baby boy two days earlier. (Id. at 358-59.) She reported feeling paranoid, insecure, and anxious. (Id. at 358.) She cried easily and slept okay. (Id.) With the exception of having a reactive affect, her mental status examination was normal. (Id.) She was started on Paxil and Xanax. (Id. at 359.)

On August 16, Plaintiff reported that she felt "'pretty good'" and had no psychotic or manic behavior. (Id. at 356-57.) Her prescriptions were renewed. (Id. at 357.) The length of time between visits was doubled from two weeks to four weeks. (Id.)

In September, Plaintiff reported to Dr. Arain that she was in a good mood and was happy taking care of her baby. (Id. at 354-55.) On examination, she was as before. (Id. at 354.) Her diagnoses were unchanged; her prescription for Paxil was increased from 30 milligrams to 40. (Id. at 355.)

Her dosage of Paxil was increased from 40 to 60 milligrams when Plaintiff saw Dr. Arain in October. (Id. at 352-53.) Her fifteen-year old daughter was back living with her. (Id. at 352.) Plaintiff had been stressed and anxious. (Id. at 352.) She wanted things to be perfect and in order. (Id.) She was having "crazy dreams," but sleeping well. (Id.) She was not experiencing manic behavior or psychosis. (Id.)

In November, Plaintiff reported to Dr. Arain that she was doing fine and sleeping well. (Id. at 350-51.) Her prescriptions and diagnoses were unchanged. (Id. at 351.)

When seeing Dr. Arain in December, Plaintiff explained that she was under stress due to an upcoming court date for an outstanding arrest warrant for receiving stolen property. (Id. at 348-49.) She attributed the charge to a friend who had thrown an empty purse into Plaintiff's trash. (Id. at 349.) On examination, she was as before with the exception of having a tearful affect, as well as a reactive one. (Id.) Her dosage of Xanax was doubled. (Id. at 349.)

Plaintiff returned within the week, explaining that the warrant had been withdrawn and she had not gone to jail. (Id. at 346-47.) Her affect was no longer tearful. (Id. at 346.)

On January 31, 2012, Plaintiff told Dr. Arain that she had been irritable, stressed, and overwhelmed. (Id. at 344-45.) She felt she had all the responsibility and no respect from her family. (Id. at 344.) Her compliance with medication was "poor." (Id.) There were no medication side effects. (Id.) Abilify and Xanax were prescribed; Paxil was not. (Id. at 345.)

On February 22, Plaintiff had a Community Support Services Assessment by a Crider Health Center treatment team, including Dr. Arain. (Id. at 374-85.) Plaintiff reported feeling aggravated, mean, and irritated. (Id. at 375.) She was living in a one-bedroom apartment with her fifteen-year old daughter and seven-month old son and was struggling to pay her utility bills. (Id.) She had a court date for stealing,[5] had recently been in a car accident, in which she totaled a friend's car, and had four tickets for driving offenses, including driving with an open container in the car. (Id.) It was noted that Plaintiff had violated her probation when she was pregnant with her son by having a urinalysis that tested positive for marijuana. (Id.) Without consulting with her psychiatrist, she would stop taking her medications if she felt they were not working. (Id.) She had a history of suicide attempts, with the last being in October 2010 when she was living with her mother and "stressed out." (Id. at 376.) Before that attempt, her last attempt was in her early 20s. (Id.) During the assessment, which took

_____

[5]Plaintiff explained that she was but a bystander when her friend stole something. In 2007, she told Dr. Bender that she had been convicted of breaking and entering when she was "simply there and not a participant" when a friend had broken into someone's residence and stolen things. (Id. at 311.)

place in her apartment, Plaintiff was fidgety, easily directed, and often had to have a question repeated.  (Id.)  Her speech was loud and fast; her attitude was disinterested; her thoughts were distracted.  (Id.)  She was hesitant to participate in treatment.  (Id.)  She admitted to shoplifting during the past year, explaining that it was a habit she had to support her family.  (Id.)  She was trying to lose weight and ate one meal a day.  (Id.)  She constantly was restless, slept an average of seven hours a night, and last had a good night's sleep two months earlier.  (Id.)  She had daily frequent mood swings and was angry for most of the day.  (Id. at 377.)  She reported that she was often anxious and restless; however, her panic attacks had lessened and she had been able to attend a Mardi Gras parade without taking a Xanax.  (Id.)  Plaintiff "[saw] her 'true family' as being friends who live in Springfield, MO," where she was born and raised.  (Id. at 378.)  Plaintiff was "ambivalent about wanting a job currently."  (Id. at 379.)  She wanted to be productive and support her family, but also worried that she would then have to pay child support and that she was not mentally stable enough.  (Id.)  She left school after the fifth grade.  (Id.)  She went to Headway Clubhouse at least once a week and occasionally went to clubs and bars with her friends.  (Id. at 319, 320.)  Plaintiff reported that she had not used marijuana since the 2011 relapse but wanted to smoke it again when she got off probation.  (Id. at 380.)  She had been smoking one-half pack of cigarettes a day until one month earlier, when she reduced it to one cigarette daily.  (Id.)  She was diagnosed with major depressive disorder, recurrent, moderate; anxiety disorder, not otherwise specified (NOS),[6]

---

[6]According to the DSM-IV-TR, each diagnostic class, e.g., adjustment disorder, has at least one "Not Otherwise Specified" category.  DSM-IV-TR at 4.  This category may be used in one of four situations:  (1) "[t]he presentation conforms to the general guidelines for a mental disorder in the

moderate; personality disorder, NOS, moderate; and cannabis dependence, in remission since 2011.  (Id. at 382-83.)  Her current GAF was 55.  (Id. at 383.)

A treatment plan was developed for Plaintiff.  (Id. at 364-74.)  Her abilities included caring for her son, cleaning the house, painting, and crocheting.  (Id. at 364.)  Her needs included money, income, a bigger apartment, and clothes for her daughter.  (Id.)  Her medications included Abilify and Xanax.  (Id.)  The first goal was for Plaintiff to stay on her medications and to keep her scheduled appointments.  (Id. at 365-66.)  She was to discuss problems with medications with a nurse or psychiatrist before making adjustments.  (Id. at 366.)  Another goal was to pay all her debts.  (Id. at 370.)  She was going to look for resources to help pay her bills.  (Id.)

Two days later, Plaintiff informed Dr. Arain that she had been in a car accident.  (Id. at 342-43.)  She had not been under the influence.  (Id. at 342.)  Her pills were in the car, which had been totaled.  (Id.)  She was compliant with her medications.  (Id.)  Her prescriptions were renewed with the caution that early refills would not be given in the future.  (Id. at 343.)

When Plaintiff saw Dr. Arain on March 28 he reported that she felt better and appeared calm; he described her mood as fair.  (Id. at 340-41.)  Prescriptions and diagnoses were unchanged.  (Id. at 341.)

---

diagnostic class, but the symptomatic picture does not meet the criteria for any of the specific disorders"; (2) "[t]he presentation conforms to a symptom pattern that has not been included in the DSM-IV but that causes clinically significant distress or impairment"; (3) the cause is uncertain; or (4) there is either insufficient data collection or inconsistent, contradictory information, although the information that is known is sufficient to place the disorder in a particular diagnostic class.  Id.

In April, Plaintiff reported to Dr. Arain that she was depressed because her disability had been denied. (Id. at 338-30.) She was sleeping okay. (Id. at 338.) Cymbalta was added to her prescriptions. (Id. at 338.)

In May, Plaintiff told Dr. Arain that she was anxious and felt overwhelmed. (Id. at 336-37.) She had been babysitting. (Id. at 336.) She was sleeping well. (Id.) On examination, she was as before with the exception of having an euthymic mood. (Id.) Neurontin was added to her medications. (Id. at 337.)

A June 14 letter from Dr. Arain to Plaintiff's attorney listed her diagnoses and medications, described her psychiatric symptoms, which were in partial remission, and opined that Plaintiff "may have difficulty working full-time job on a sustained basis, deal with work related stress, behave in emotionally stable manner and demonstrate reliability. Her impairment may cause her to be absent from work." (Id. at 387.) She had a "history of anxiety, depression and mood swings that caused repeated episodes of decompensation and difficulties in maintaining social functioning, requiring hospitalizations." (Id.)

Also before the ALJ were reports of non-examining and examining consultants.

The earliest report is that of an August 2007 psychological evaluation by Joan Bender, Ph.D., a clinical psychologist, performed pursuant to Plaintiff's request for medical assistance. (Id. at 311-18.) Plaintiff described an extensive history of abuse, beginning with physical and mental abuse by her mother, childhood sexual abuse by her mother's boyfriends, and physical and sexual abuse by her various boyfriends, including the one she was currently living with. (Id. at 311-12.) She had abused alcohol for six months when she was 21 and had daily used

marijuana from age 12 or 13 until six months earlier.  (Id. at 311.)  She had quit school after

the fourth grade.  (Id. at 312.)  She was not taking any medications and was not receiving any

counseling.  (Id. at 311, 313.)  After examining Plaintiff, Dr. Bender diagnosed her with

major depression, recurrent, PTSD, panic disorder with agoraphobia, and cannabis

dependence, in full remission for six months.  (Id. at 314.)  She opined that Plaintiff could

understand and recall simple instructions, but did not appear to be able to concentrate on

simple tasks.  (Id.)  She had been able to name the past four United States presidents.  (Id. at

313.)  Plaintiff's GAF was 40.[7]  (Id. at 314.)

On a separate form, Dr. Bender rated Plaintiff as being mildly limited in one of the

three abilities listed for the domain of understanding and memory, not significantly limited

in one, and markedly limited in the third.  (Id. at 315-16.)  She was markedly limited in the

eight abilities listed for the domain of sustained concentration and persistence and in the five

abilities listed for the domain of social interaction.  (Id. at 316-18.)  In the domain of

adaptation, Plaintiff was markedly limited in one ability, moderately limited in one, and

mildly limited in the remaining two.  (Id. at 318.)

The following month, at Plaintiff's counsel's request, Plaintiff was evaluated by Sharol

McGehee, Psy.D.  (Id. at 321-29.)  She was taking citalopram and diazepam (the generic form

of Valium) from a Dr. Ngo.  (Id. at 323.)  On examination, Dr. McGehee found her to be

severely impaired in all four domains.  (Id.)  She could carry out short, simple instructions

---

[7]A GAF score between 31 and 40 is indicative of "[s]ome impairment in reality testing or
communication . . . OR major impairment in several areas, such as work or school, family relations,
judgment, thinking, or mood . . . ."  DSM-IV-TR at 34 (emphasis omitted).

and make simple work-related decisions, but had difficulty working with other people, following directions, performing activities within a schedule, maintaining attendance, and being punctual. (Id.) She tended to blame other people for her problems and was psychotic. (Id.) Dr. McGehee diagnosed Plaintiff with bipolar disorder and personality disorder. (Id.) She rated her current GAF as 31. (Id. at 324.) Similarly to Dr. Bender, Dr. McGehee assessed Plaintiff as being markedly limited in the majority of activities for the domain of concentration and persistence. (Id. at 327.) She was markedly limited in one activity in the domain of understanding and memory, but was only mildly limited in the other two. (Id.) In the domain of social interaction, Plaintiff was markedly limited in one activity, moderately limited in one, and mildly limited in the remaining two. (Id. at 328.) In the domain of adaption, Plaintiff was markedly limited in one activity, moderately limited in two, and mildly limited in one. (Id.) Dr. McGehee opined that Plaintiff would need to be absent from work more than four days a month because of her symptoms. (Id. at 329.)

In January 2011, Thomas J. Spencer, Psy.D., conducted a psychological evaluation of Plaintiff. (Id. at 232-35.) Plaintiff complained of depression, described various hospitalizations and suicide attempts, including stabbing herself in the arm, and reported that she was currently taking Prozac and Xanax and had been feeling "'okay'" for the past few months. (Id. at 232.) She had trouble going to sleep and staying asleep, but not with going back to sleep when awoken. (Id. at 233.) She did not believe her attention and concentration were markedly impaired. (Id.) She had trouble controlling her temper and could become emotionally and physically abusive. (Id.) She had recently been married, but the marriage

lasted only two weeks. (Id.) She was five months' pregnant. (Id. at 234.) She dropped out of school in the sixth grade and "claimed to receive special education services." (Id.) She appeared to be of low average to average intelligence. (Id.) She had a history of marijuana and alcohol use and reported she had not used either since 2007. (Id.) She was currently on probation for a felony conviction for possession. (Id.) She "presented as agitated initially" but calmed down as the interview progressed. (Id.) She had no obvious impairment in grooming or hygiene. (Id.) She was fidgety, restless, cooperative, and alert and oriented to time, place, person, and event. (Id.) Her insight and judgment were questionable. (Id.) Dr. Spencer concluded that Plaintiff can understand and remember simple to moderately complex instructions, can engage in and persist with simple to moderately complex tasks, is moderately impaired in her ability to interact socially, and might have trouble adapting to change in the workplace. (Id. at 235.) He diagnosed her with bipolar disorder, cannabis/alcohol abuse (by history), and borderline personality traits. (Id.) He rated her GAF as 50 to 55. (Id.)

In February 2011, a Psychiatric Review Technique form was completed for Plaintiff by a non-examining consultant, Marsha Toll, Ph.D. (Id. at 296-307.) Plaintiff was assessed as having an affective disorder, i.e., bipolar disorder, a personality disorder, i.e., borderline personality traits, and substance addiction disorders, i.e., cannabis and alcohol abuse. (Id. at 296, 299, 301, 302.) These disorders resulted in mild restrictions in her daily living activities, moderate difficulties in maintaining social functioning, and moderate difficulties in

maintaining concentration, persistence, or pace.  (Id. at 304.)  They also caused four or more repeated episodes of decompensation of extended duration.  (Id.)

On a Mental Residual Functional Capacity Assessment form, Dr. Toll assessed Plaintiff as being moderately limited in two of the three abilities in the area of understanding and memory, i.e., (i) remembering locations and work-like procedures and (ii) understanding and remembering detailed instructions, and not significantly limited in one.  (Id. at 308.)  In the area of sustained concentration and persistence, Plaintiff was moderately limited in four of the eight listed abilities, i.e., (i) carrying out detailed instructions, (ii) maintaining attention and concentration for extended periods, (iii) working in coordination with or proximity to others without being distracted from them, and (iv) completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods.  (Id. at 308-09.) She was not significantly limited in the other four abilities.  (Id.)  In the area of social interaction, Plaintiff was moderately limited in all but one of the five listed abilities.  (Id. at 309.) That one ability was asking simple questions or requesting assistance.  (Id.)  In the area of adaptation, she was not significantly limited in three of the four abilities and was moderately limited in her ability to respond appropriately to changes in the work setting. (Id.)

In August 2012, after reviewing Plaintiff's medical records at the ALJ's request, James D. Reid, Ph.D., rated Plaintiff's degree of functional limitations in four domains.  (Id. at 407.) He assessed her as having mild restrictions in her activities of daily living, marked difficulties in maintaining social functioning, and marked difficulties in maintaining concentration,

persistence or pace. (Id.) She had had one episode of decompensation of extended duration. (Id.) He questioned whether Plaintiff was in remission for drug and alcohol abuse, noting that she had tested positive for cannabis when pregnant in 2011 and was ticketed for driving with an open container in 2012. (Id.) He also noted that she had not been compliant with her medications. (Id.) He concluded that "the evidence points to active addiction with antisocial behaviors and dramatic, erratic and emotional behaviors – often fueled by substance." (Id. at 408.)

On a Medical Source Statement of Ability to Do Work Related Activities (Mental), Dr. Reid assessed Plaintiff as having moderate limitations in her ability to understand, remember, and carry out simple instructions and marked limitations in her ability to understand, remember, and carry out complex instructions and to make judgments on simple or complex work-related decisions. (Id. at 411.) Her ability to interact with others was affected by her impairments. (Id. at 412.) Specifically, she had marked limitations in her ability to interact appropriately with the public, supervisors, and co-workers and to respond appropriately to usual work situations and to changes in a routine work setting. (Id.) Absent substance abuse, her limitations would be moderate rather than marked. (Id.)

Asked to respond to Dr. Reid's findings, Plaintiff's counsel agreed that the findings of "marked" limitations were supported by the record, but disagreed that those limitations were attributable to drug or alcohol abuse. (Id. at 227.) Counsel noted that the records reflected that Plaintiff's substance abuse was in remission and had been for a long period of time. (Id.)

## The ALJ's Decision

The ALJ first determined that Plaintiff had not engaged in substantial gainful activity since her application date of October 23, 2010. (Id. at 13.) The ALJ next found that Plaintiff had severe impairments of blindness in her right eye; bipolar affective disorder, alternately diagnosed as major depressive disorder; anxiety disorder, NOS, alternately diagnosed as PTSD and panic disorder with agoraphobia; and personality disorder with borderline and antisocial traits. (Id.) Her hepatitis C and obesity were not severe. (Id. at 13-14.) Nor were her substance abuse disorders. (Id. at 14.) There was evidence of only one use of marijuana since her application date. (Id.) Although she had been ticketed for driving with an open container in the car, there was evidence that the container may have belonged to her passenger. (Id.) There was no evidence of the use of cocaine since the amended alleged disability onset date. (Id.)

The ALJ next found that Plaintiff's impairments did not, singly or combined, meet or medically equal an impairment of listing-level severity. (Id. at 15.) The ALJ specifically found that Plaintiff had mild restrictions in her activities of daily living and moderate difficulties in social functioning and in maintaining concentration, persistence of pace. (Id. at 15-16.) The record reflected that Plaintiff lived with her two children and no other adults since February 2011, kept her apartment clean, prepared meals, shopped, crocheted, and gardened. (Id.) She was consistently described as having fair to good grooming, hygiene, and dress. (Id.) Although Plaintiff testified to trying to avoid people and having conflicts with her mother and teenage daughter, she also stated that she had friends in her former town,

did not have problems with aggression, sometimes went to nightclubs with friends, had attended a Mardi Gras parade, and was consistently observed to be pleasant, cooperative, and appropriate. (Id. at 16.) Plaintiff told the examiner in January 2011 that she did not believe that her abilities to maintain attention and concentration were markedly impaired; she had performed well on memory tests, but did have some difficulties on tests of concentration and mental control. (Id. at 17.) On examination, Plaintiff routinely had intact memory and was distracted. (Id.) And, she had had no episodes of decompensation since her application date. (Id.) Although she reportedly attempted to harm herself in October 2010, there were no records of a hospitalization and no indication her mental symptoms had worsened around that time, as required for a finding of an episode of decompensation. (Id.) Dr. Toll's finding to the contrary was apparently based on Plaintiff's report of multiple hospitalizations – a report not supported by the record. (Id.) She has always been able to care for herself. (Id.)

With her impairments, Plaintiff has the residual functional capacity (RFC) to perform a full range of work at all exertional limitations but with nonexertional limitations of not using binocular vision[8] and being limited to performing simple, repetitive work tasks and occasional interaction with the public. (Id. at 18.) She can tolerate frequent interaction with

_____

[8]When questioning the VE, the ALJ had described the hypothetical claimant as being unable to use monocular vision. "In binocular vision, two eyes work together to focus on a single point." What Is the Difference between Monocular and Binocular Vision, http://www.wisegeekhealth.com/what-is-the-difference-between-monocular-and-binocular-vision.htm#didyouknowout (last visited Dec. 17, 2014). People who have lost vision in one eye, e.g., Plaintiff, have monocular vision. Id. Neither party argues that the ALJ's incorrect reference to monocular vision, made during a hearing in which it was expressly stated that Plaintiff was blind in one eye, misled the VE.

coworkers and supervisors.  (Id.)  In making this determination, the ALJ gave the opinion of Dr. Spencer great weight, finding it consistent with his own "thorough examination" and with the other objective evidence of record.  (Id. at 19.)  She also gave "significant weight" to Dr. Toll's opinion, finding it also to be consistent with the record.  (Id. at 19-20.)  She gave little weight to the opinions of Drs. Arain, Reid, Bender, and McGehee.  (Id. at 20-22.)  Although Dr. Arain was Plaintiff's treating psychiatrist, his opinion was inconsistent with the record and with his own treatment notes.  (Id. at 20.)  The medical evidence did not support Dr. Reid's opinion that Plaintiff had an active substance addiction.  (Id. at 21.)  Dr. Bender's opinion was also inconsistent with the record and was based on Plaintiff's self-report of symptoms, e.g., auditory hallucinations, that were never noted in her treatment notes.  (Id.) It was also internally inconsistent in that Dr. Bender opined that Plaintiff had marked limitations in her abilities to carry out simple instructions and make simple work-related decisions but could handle her own funds.  (Id. at 22.)  Also, the examination was done and the opinion rendered three years before Plaintiff's application date.  (Id.)  Similarly, Dr. McGehee's report was based on Plaintiff's subjective reports, including her denial of ever abusing alcohol, was inconsistent with the objective evidence, and was issued three years before the application date.  (Id.)

The ALJ then considered Plaintiff's credibility.  (Id. at 23-26.)  After outlining the governing criteria and summarizing the record, the ALJ noted, inter alia, that Plaintiff had a conservative treatment history, was able to stop medications during her pregnancy without her symptoms worsening, and made inconsistent statements, e.g., attending a Mardi Gras

parade but testifying she cannot tolerate groups of people and changing the level of education she had and the years when she stopped abusing various substances. (Id. at 23-25.) Also detracting from Plaintiff's credibility were her "robust activities of daily living" and her sporadic work history with low lifetime earnings. (Id. at 26.) The ALJ concluded that Plaintiff's allegations are credible only to the extent they are consistent with her RFC findings. (Id.)

The ALJ next concluded that Plaintiff has no past relevant work. (Id. at 27.) With her age, marginal education, and RFC, she can perform work as outlined by the VE. (Id. at 27-28.) The ALJ decided that Plaintiff is not disabled as defined in the Act. (Id. at 28.)

## Standards of Review

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). Not only the impairment, but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months. **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002). Additionally, the impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work." 42 U.S.C. § 1382c(a)(3)(B).

"The Commissioner has established a five-step 'sequential evaluation process' for determining whether an individual is disabled.'" **Phillips v. Colvin**, 721 F.3d 623, 625 (8th Cir. 2013) (quoting Cuthrell v. Astrue, 702 F.3d 1114, 1116 (8th Cir. 2013) (citing 20 C.F.R. § 416.920(a)). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 n.3 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. § 416.920(b); **Hurd**, 621 F.3d at 738. Second, the claimant must have a severe impairment. See 20 C.F.R. § 416.920(c). A"severe impairment" is "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." Id.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. § 416.920(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits. **Bowen v. City of New York**, 476 U.S. 467, 471 (1986); **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations." **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009) (Moore I). "[A]n RFC determination must be based on a claimant's ability 'to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful

conditions in which real people work in the real world.'" **McCoy v. Astrue**, 648 F.3d 605, 617 (8th Cir. 2011) (quoting Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007)). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" **Moore I**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).

"'Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)). This evaluation requires the ALJ consider "'[1] the claimant's daily activities; [2] the duration, frequency and intensity of the pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness and side effects of medication; [5] functional restrictions.'" **Id.** (quoting Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218). After considering the *Polaski* factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Ford v. Astrue**, 518 F.3d 979, 982 (8th Cir. 2008); **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 416.920(e). The burden at step four remains

with the claimant to prove her RFC and establish she cannot return to her past relevant work.

**Moore I**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006);

**Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

      If, as in the instant case, the ALJ holds at step four of the process that a claimant

cannot return to past relevant work, the burden shifts at step five to the Commissioner to

establish the claimant maintains the RFC to perform a significant number of jobs within the

national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v.**

**Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 416.920(f). The

Commissioner may meet her burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at

1219, based on hypothetical questions that "'set forth impairments supported by substantial

evidence on the record and accepted as true and capture the concrete consequences of those

impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A.,

486 F.3d 359, 365 (8th Cir. 2007)).

      If the claimant is prevented by her impairment from doing any other work, the ALJ

will find the claimant to be disabled.

      The ALJ's decision whether a person is disabled under the standards set forth above

is conclusive upon this Court "'if it is supported by substantial evidence on the record as a

whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547

F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir.

2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as

adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting Goff

v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)).  When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision.  **Moore v. Astrue**, 623 F.3d 599, 602 (8th Cir. 2010); **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935.  The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730.  "'If after reviewing the record, the [C]ourt finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the [C]ourt must affirm the ALJ's decision.'" **Partee**, 638 F.3d at 863 (quoting Goff, 421 F.3d at 789).

### Discussion

Plaintiff argues that the ALJ erred when evaluating her RFC because she impermissibly disregarded the opinion of Dr. Arian, citing inconsistencies which do not exist or are not probative; discounted Dr. Toll's finding Plaintiff had four or more episodes of decompensation of extended duration; and insufficiently analyzed her friend's corroborative Function Report.  The ALJ further erred by not including all the concrete consequences of her impairments in the hypothetical question posed to the VE.

RFC.  "Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis.  A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule.

RFC does not represent the *least* an individual can do despite his or her limitations, but the *most*." S.S.R. 96-8p, 1996 WL 374184, *2 (S.S.A. July 2, 1996) (footnote omitted). Plaintiff argues the ALJ erred by discounting the opinion of her treating physician, Dr. Arian, when determining that she has the RFC to perform a full range of work at all exertional limitations but with nonexertional limitations of not using binocular vision; being limited to performing simple, repetitive work tasks; and having only occasional interaction with the public while able to tolerate frequent interaction with coworkers and supervisors.

It is undisputed that Dr. Arian is Plaintiff's treating physician, having first seen her in March 2010 and being her only consistent health care provider thereafter. See 20 C.F.R. § 416.902 (defining "treating source" as a claimant's "own physician, psychologist, or other medical source who provides [claimant], or has provided [claimant] with medical treatment or evaluation and who has, or has had, an ongoing relationship with [claimant]."). "The regulations provide that if the ALJ finds 'that a treating source's opinion on the issue(s) of the nature and severity of [the applicant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and *is not inconsistent with the other substantial evidence in [the applicant's] record,* [the ALJ] will give it controlling weight.'" **Wagner**, 499 F.3d at 848-49 (quoting 20 C.F.R. § 404.1527(d)(2)). Thus, "while a treating physician's opinion is generally entitled to substantial weight, such an opinion does not automatically control because the [ALJ] must evaluate the record as a whole." **Id.** at 849 (internal quotations omitted). And, "the burden of persuasion to prove disability and

demonstrate RFC [is] on the claimant." **Vossen v. Astrue**, 612 F.3d 1011, 1016 (8th Cir. 2010).

In the instant case, the ALJ discounted the opinion, in part, because it was inconsistent with Dr. Arian's own treatment notes. "It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes." **Davidson v. Astrue**, 578 F.3d 838, 843 (8th Cir. 2009); accord **Turpin v. Colvin**, 750 F.3d 989, 993 (8th Cir. 2014). See also **Anderson v. Astrue**, 696 F.3d 790, 794 (8th Cir. 2012) (affirming ALJ's rejection of treating physician's opinions about claimant's exertional limitations that "[were] not reflected in any treatment notes or medical records"). As noted by the Commissioner, the examination findings of Dr. Arian consistently are that Plaintiff was cooperative, alert, and had good eye contact, normal speech, logical and goal-directed thought, fair insight and judgment, fair intellect, and no delusions, paranoia, or homicidal or suicidal ideations. These were the examination findings even when Plaintiff reported being easily angered, agitated, or irritated. In **Halverson v. Astrue**, 600 F.3d 922, 930 (8th Cir. 2010), the Eighth Circuit found no error in the ALJ's decision not to give a treating psychiatrist's opinion that the claimant could not perform various job-related tasks any weight when his mental status examinations consistently noted that he was alert and oriented with normal speech and thought processes. See also **Wiese**, 552 F.3d at 730-31 (finding that ALJ had not erred in not finding claimant disabled when record included report by claimant's treating psychiatrist that her thought processes were logical, sequential, and goal-oriented and

findings of treating therapist that her intellectual functioning was average and her thought content was logical and relevant).

Clearly, any description supportive of Plaintiff's reported limitations precluding work are based on her subjective complaints. An ALJ, however, may discount a treating physician's opinion that is based on the claimant's subjective complaints. See **Renstrom v. Astrue**, 680 F.3d 1057, 1065 (8th Cir. 2012) (ALJ properly gave treating physician's opinion non-controlling weight when, among other things, that opinion was largely based on claimant's subjective complaints); **Kirby v. Astrue**, 500 F.3d 705, 709 (8th Cir. 2007) (finding that ALJ was entitled to discount treating physician's statement as to claimant's limitations because such conclusion was based primarily on claimant's subjective complaints and not on objective medical evidence); **Craig v. Apfel**, 212 F.3d 433, 436 (8th Cir. 2000) (rejecting claimant's argument ALJ had improperly ignored portions of treating physician's opinion when the portions were based on claimant's subjective descriptions). Plaintiff contends the ALJ improperly found her complaints not to be fully credible.

"'If an ALJ expressly discredits the claimant's testimony and gives good reason for doing so, [the Court] will normally defer to the ALJ's credibility determination.'" **Boettcher v. Astrue**, 652 F.3d 860, 865 (8th Cir. 2011) (quoting Juszczyk v. Astrue, 542 F.3d 626, 632 (8th Cir. 2008)); accord **Buckner v. Astrue**, 646 F.3d 549, 558 (8th Cir. 2011). Among the reasons given by the ALJ for discounting Plaintiff's credibility is her poor work record. This a proper detraction from her credibility. See **Id.**; **Wildman v. Astrue**, 596 F.3d 959, 968-69 (8th Cir. 2010). **Choate v. Barnhart**, 457 F.3d 865, 871 (8th Cir. 2006). Plaintiff's highest

earnings, in 2006, averaged less than $833 a month. This is less than the $860 a month considered by the Social Security Administration to be substantial gainful activity for that year. See Substantial Gainful Activity, http://www.socialsecurity.gov/OACT/COLA/sga.html (last visited Dec. 18, 2014).

Another good reason are the inconsistencies in the record. See **Raney v. Barnhart**, 396 F.3d 1007, 1011 (8th Cir. 2005) (affirming ALJ's adverse credibility determination based, in part, on inconsistency between claimant's allegations and objective medical evidence including, inter alia, "documented inconsistent statements to medical professionals"). The record is replete with inconsistent statements by Plaintiff. Such inconsistencies include Plaintiff's testimony she was okay when at home but not when in public compared to her activities of going to clubs and bars with friends, attending a Mardi Gras parade, and maintaining friends in the town she grew up in. Indeed, a friend she had known for a year completed a Function Report on her behalf. She was inconsistent with the nature and duration of her substance abuses. For example, she told Dr. Arian that she started drinking alcohol at age 21, which was in 1998, and stopped in 1999; started using marijuana at age 10, which was in 1987, and stopped in 2007; and started using cocaine in 2003 and stopped in 2005. However, she was in rehabilitation in 2009 – two years after she stopped the last substance abuse. She told Dr. Bender that she had drunk alcohol for six months when she was 21 and used marijuana for six months when she was 12 or 13 years old. She later told a provider at Crider that she intended to resume smoking marijuana when she was no longer on probation for possession. When applying for SSI, she reported that she had completed the sixth grade

and not been in special education; she testified she left school in the sixth grade; she told a Crider provider that she left after fifth grade; told Dr. Bender that she left after fourth grade; and told Dr. Spencer that she left in the sixth grade due to learning and family problems. (Id.) She testified she hates driving, but she does no regularly. She told Dr. Bender she was not on any medications; she told Dr. McGehee the next month she was on two medications, citalopram, an antidepressant, and diazepam, an anti-anxiety medication, yet there is no record of any treatment received in the interim.

The ALJ also considered Plaintiff's daily activities as detracting from her credibility. Plaintiff correctly notes that "'a claimant need not be completely bedridden . . . to be considered disabled.'" **Toland v. Colvin**, 761 F.3d 931, 936 (8th Cir. 2014) (quoting Anderson, 696 F.3d at 794) (alteration in original). The daily activities of Plaintiff, however, are more extensive than that. In addition to caring for an infant and a teenage daughter, Plaintiff has, during the period at issue, been able to leave her mother's house and obtain an apartment, regain custody of her teenage daughter, and engage in such hobbies as gardening and crocheting items based on patterns shown in videos. Moreover, she attends a group once a week and socializes with friends. See **McDade v. Astrue**, 720 F.3d 994, 998 (8th Cir. 2013) (affirming ALJ's adverse credibility determination when claimant's activities of daily living included cooking, taking care of his dogs, using a computer, driving with a neck brace, and shopping for groceries with the use of an electric cart). "'[I]f a doctor evaluates a patient as having more physical limitations than the patient actually exhibits in her daily living, an

ALJ need not ignore the inconsistency.'" **Toland**, 761 F.3d at 936 (quoting <u>Anderson</u>, 696 F.3d at 794).

Moreover, with the exception of the ECT treatments, which were never repeated after the application date, Plaintiff routinely received conservative treatment, seeing Dr. Arian for brief sessions on a monthly basis and having occasional minor adjustments in her medications. As found by the ALJ, conservative treatment may weigh against a claimant's credibility. <u>See</u> **Smith v. Colvin**, 756 F.3d 621, 626 (8th Cir. 2014); **Moore I**, 572 F.3d at 524-25.

In addition to the foregoing supporting the ALJ's consideration of Dr. Arian's opinion, the Court notes that the opinion itself is ambivalent.[9] In the opinion at issue, the June 14 letter, Dr. Arain writes that Plaintiff "*may* have difficulty working full-time job on a sustained basis, deal with work related stress, behave in emotionally stable manner and demonstrate reliability." (R. at 387.) "Her impairment *may* cause her to be absent from work." (<u>Id.</u>) at 387.)

For the foregoing reasons, the ALJ did not err in her weighing of Dr. Arian's opinion. <u>See e.g.</u> **Teague v. Astrue**, 638 F.3d 611, 615-16 (8th Cir. 2011) (finding substantial evidence existed to support ALJ's decision to discount opinions of treating physician and of consulting, examining psychologist regarding claimant's functional limitations that were inconsistent with their own notes and findings and were based instead on claimant's subjective complaints).

---

[9]For this reason also, Plaintiff's argument that Dr. Arian's opinion was to be given significant weight even if not controlling weight is without merit.

Plaintiff further argues that the ALJ also erred when disregarding Dr. Toll's finding that she had had four or more episodes of decompensation of extended duration. This finding was properly discounted because it was based on Plaintiff's report – the credibility of which is addressed above – and unsupported otherwise by the record.

Plaintiff next argues that the ALJ insufficiently analyzed her friend's corroborative Function Report. Although the observations of third-parties may support a claimant's credibility, see 20 C.F.R. § 416.929(c)(3) (listing information from other people about a claimant's pain or other symptoms as a factor to be considered when evaluating a claimant's credibility), the report at issue generally either echoed the statements in Plaintiff's report about her symptoms and their effects or answered "don't know" in response to questions. In **Buckner**, 646 F.3d at 559-60, the Eighth Circuit held that an ALJ's failure to specifically address supporting claims by the claimant's girlfriend about his condition when those statements could be discredited for the same reason as had the claimant's statements was not error. Accordingly, Plaintiff's argument is without merit.

Hypothetical Question. As noted above, a hypothetical question to a VE must "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments.'" **Jones**, 619 F.3d at 972 (quoting Hiller, 486 F.3d at 365). Without citing which such consequences the ALJ omitted, Plaintiff argues that they were.

An ALJ is not required to include in a hypothetical posed to a VE impairments the ALJ has found not to be supported by the record. **Prosch v. Apfel**, 201 F.3d 1010, 1015 (8th Cir.

2000) (rejecting claimant's argument that the hypothetical should have included limitations found by his treating physician after holding that the ALJ had properly rejected the treating physician's opinion). Because the ALJ's RFC findings are supported by substantial evidence on the record as a whole, the hypothetical question posed to the VE was not deficient.

### Conclusion

An ALJ's decision is not to be disturbed "'so long as the . . . decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because [the Court] might have reached a different conclusions had [the Court] been the initial finder of fact.'" **Buckner**, 646 F.3d at 556 (quoting Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008)). Although Plaintiff articulates why a different conclusion might have been reached, the ALJ's decision, and, therefore, the Commissioner's, was within the zone of choice and should not be reversed for the reasons set forth above.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and this case is DISMISSED.

An appropriate Order of Dismissal shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  22nd  day of December, 2014.